UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN  STURM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:14-cv-00848-RLY-MPB |
| | ) | |
| CITY OF INDIANAPOLIS, | ) | |
| OFFICER CATHERINE HEDGES, in her | ) | |
| official and individual capacities, and | ) | |
| OFFICER GREGORY STEWART, in his | ) | |
| official and individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In the early morning hours of September 21, 2012, Plaintiff, John Sturm, was

arrested by Officer Catherine Hedges of the Indianapolis Metropolitan Police Department

("IMPD") for public intoxication and resisting law enforcement.  Following his acquittal,

Plaintiff brought the present action under 42 U.S.C. § 1983 ("Section 1983") against

Officer Hedges and Officer Gregory Stewart, who assisted Officer Hedges that evening,

alleging various violations of his Fourth Amendment rights.  Plaintiff also brings state

law claims against Officer Hedges for battery and malicious prosecution, and state law

negligence claims against the City of Indianapolis, Officer Hedges and Officer Stewart.

Defendants now move for summary judgment.  For the reasons set forth below,

Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in

part**.

1

## I.     Factual Background

As this is a motion for summary judgment brought by the Defendants, the court must take the facts and all reasonable inferences that arise therefrom in the light most favorable to the Plaintiff.

On Thursday, September 20, 2012, Plaintiff went to visit his friend, Patrick Schell, who lived at 3258 Davis Drive in Indianapolis, Indiana.  (Filing No. 76-1, Deposition of John Strum ("Plaintiff Dep.") at 20-21).  While there, Plaintiff consumed three to four beers between 9:00 p.m. and 12:00 a.m.  (*Id*. at 21-23).

Schell's nephew, Jonathen Fields, lived with Schell.  (Filing No. 76-3, Deposition of Johnathen Fields ("Fields Dep.") at 11).  After Fields finished his restaurant shift that evening, he arrived home around 9:30 or 10:00 p.m.  (*Id*. at 12-13).  He went to bed not long thereafter.  (*Id*. at 13).

Sometime between 2:00 and 3:00 a.m. on Friday, September 21, 2012, Plaintiff, who was wearing blue jeans and a dark jacket, went out to his 1971 Cutlass Supreme, still parked in Schell's driveway, to retrieve his cell phone charger.  (Plaintiff Dep. at 25, 47, 78; Fields Dep. at 18-19).  Plaintiff turned on an overhead light, heard a "pop" sound under the hood, and the overhead light went out.  (Plaintiff Dep. at 26, 78).  Plaintiff attempted to start his car, but it was dead.  (*Id*.).  Plaintiff then opened the hood of his car to assess and fix the problem.  (*Id*.).  Eventually, Fields came outside to assist Plaintiff and offered to get Plaintiff a lantern.  (*Id*. at 27, 79).  After Fields retrieved a lantern, Plaintiff indicated he needed to use the bathroom and went into the backyard for that purpose.  (*Id*.).

2

Unbeknownst to Plaintiff and Fields, officers with the IMPD had just been dispatched to the area to conduct a security check based on a 911 call. (Filing No. 76-9, Law Enforcement Event History Detail/Computer Aided Dispatch Report ("CAD") at 2:51:22). The 911 call had been placed by a woman who lived on Mooresville Road in the house directly behind Schell's house and whose backyard abutted Schell's backyard. (*Id.* (showing address of 911 call)). The 911 caller reported that she heard suspicious noises and believed someone was breaking into one of her neighbors' sheds, but that she had not actually seen anything. (*Id.*; Filing No. 76-6, Deposition of Robert Hatch ("Hatch Dep.") at 14). Officer Hedges and Officer Robert Hatch were dispatched to investigate the matter. (CAD at 2:52:09).

When Officer Hatch arrived in the area of the reported burglary in progress, he parked his marked patrol car on Mooresville Road and went into the 911 caller's backyard to investigate the matter. (Hatch Dep. at 14-16). Officer Hatch heard muffled voices and advised Officer Hedges to approach from Davis Drive to try to get a visual of what he was hearing. (*Id.* at 16, 17, 19). At about the same time, Officer Stewart and his K-9 Officer joined Officer Hatch in the 911 caller's backyard to assist with the investigation. (Filing No. 76-5, Deposition of Gregory Stewart ("Stewart Dep.") at 17-18). Officer Hedges radioed to Officer Hatch that there were two individuals in the front of the house. (Hatch Dep. at 26).

Fields observed the headlights of an unknown car when Plaintiff stated he had to use the restroom. (Fields Dep. at 21-23). Officer Hedges pulled up to Schell's home in

her police vehicle.  (Hedges Dep. at 17).  At that time, Plaintiff was walking towards the backyard and did not observe Officer Hedges' approach.  (Plaintiff Dep. at 31).

When she arrived at the scene, Officer Hedges noticed the hood was up on one of the cars and one of the men had a flashlight.  (Hedges Dep. at 16, 40, 46).  Officer Hedges "jumped out of her car and ran at [Fields] asking [him] where [Plaintiff] went." (Fields Dep. at 24).  Fields told Officer Hedges that he and Plaintiff were working on Plaintiff's car, and that Plaintiff went to the backyard to use the restroom.  (*Id.*; Hedges Dep. at 24, 40).  Officer Hedges began to walk around the same side of the house (the right side) where Plaintiff had gone, and then came back to the front of the house to ask Fields questions.  (*Id.*).

Officers Hatch and Stewart witnessed Plaintiff walk into the backyard at a normal pace.  (Hatch Dep. at 26, 28, 60, 61; Stewart Dep. at 25, 32).  The officers observed Plaintiff attempt to open the sliding glass door; when he could not get in, they observed him walk to the privacy fence on the other side of the house and attempt to look over it. (Hatch Dep. at 26-27, 29-32; Stewart Dep. at 27-32).  Plaintiff's testimony differs from the officers'; Plaintiff recalls that immediately after he relieved himself near the back porch area, he walked to the front of the house.  (Plaintiff Dep. at 27).  At any rate, Officer Hatch "alerted Officer Hedges that he was returning to the front yard."  (Hatch Dep. at 32; Hedges Dep. at 23).

As soon as Plaintiff returned to the front of the house, Officer Hedges immediately told him, "Put your hands behind your back."  (Plaintiff Dep. at 31; *see also* Fields Dep. at 27; Hedges Dep. at 24-25).  As Officer Hedges drew closer to Plaintiff, she smelled

4

alcohol on his breath and felt nervous because he had his hands in his pockets.  (Filing No. 76-7, Trial Transcript ("Trial Tr.") at 41).  Plaintiff turned away from her and "slowly" started to put his hands behind his back when he turned his head and saw her pull out her handcuffs.  (Plaintiff Dep. at 31, 34, 40; Fields Dep. at 29).  Plaintiff then put his hands up in the air and asked Officer Hedges, "What's going on?" (Plaintiff Dep. at 31, 34; Fields Dep. at 30).  Fields heard Officer Hedges "aggressively" command Plaintiff, "Sir, you need to put your hands behind your back" and "Sir, you need to be quiet."  (Fields Dep. at 30-31).  At that point, Plaintiff "didn't know what to think" because, as he puts it, there was a "police officer on private property for no reason randomly on my friend's property arresting me for – I'd assume arresting me for no reason . . . ." (Plaintiff Dep. at 35).  Plaintiff started to "casually" walk toward the front door of the house "and then [Officer Hedges] shot [him] with a taser" without warning. (*Id.* at 31, 34; Fields Dep. at 30, 32-33, 35; *see also* Hedges Dep. at 33 ("Q: Did you announce to him you were going to tase him? A: You know what, I don't recall.")).

According to Officer Hedges, Plaintiff refused to take his hands out of his pockets. (Hedges Dep. at 26).  When he finally complied with her order, she told him to turn around and place his hands in the air.  (*Id.* at 27).  When she attempted to place handcuffs on his hands, Plaintiff turned around and gave her a "very angry stare" and went into a "fighting stance" with clenched fists.  (Hedges Dep. at 28-29).  This made "the hairs on her neck stand up, like he was trying to harm [her]."  Officer Hedges, who at that time was approximately seven to eight feet away from Plaintiff, yelled, "Don't you move" and announced over her radio that she had a resistor and was tasing.  (Filing No. 77, 911 call,

Track 4 at 1:51-1:54; Plaintiff Dep. at 39).  At that point, Officer Hedges took a step

backward, grabbed her taser and deployed it in dart mode on Plaintiff's back.  (Hedges

Dep. at 32).

After he was hit with the taser Plaintiff felt immense pain, his body locked up, and

he fell face forward onto the ground "like a board."  (Plaintiff Dep. at 34, 44, 50).  His

head and upper torso were on the concrete pad of the front porch, and his legs and feet

were on the grass.  (*Id.* at 46; Hedges Dep. at 36).  Fields described Plaintiff as being in a

"contorted" position.  (Fields Dep. at 39).  According to Officer Hedges, she saw him

"try to do a push-up," so she verbally told Plaintiff to stop resisting.  (Hedges Dep. at 34).

She then deployed the taser on Plaintiff again.  (*Id.* at 37-38).  Plaintiff's recollection

conflicts with Officer Hedges' account.  He remembers feeling completely immobilized

and incapacitated but she nevertheless "repeatedly tased me."  (Plaintiff Dep. at 34).

Fields' recollection conflicts with Officer Hedges' testimony too.  Fields testified that

Plaintiff did not try to get up because he did not have a chance to; "they continued to tase

him, if that's even possible."  (*Id.* at 42).  After being tased by Officer Hedges, Plaintiff

felt "fuzzy" and "hazy" for a moment.  (Plaintiff Dep. at 34, 42).

Officer Hatch and Officer Stewart heard Officer Hedges shouting, so they

(including the K-9 Officer) jumped the fence and ran to her location.  (Hatch Dep. at 32-

33; Stewart Dep. at 43).  En route, Officer Stewart could hear the distinctive sound of a

taser.  (Stewart Dep. at 48).  When Officer Stewart arrived at the front porch area of the

house, he informed Plaintiff to stay on the ground or risk getting bitten by the K-9

Officer.  (*Id.* at 47-48).  Officer Hedges told Officer Hatch to secure Plaintiff in

handcuffs, which he did.  (Trial Tr. at 39; Hatch Dep. at 35; Stewart Dep. at 51-52).  At that point, Officer Hedges walked over to where Fields was standing, obtained his identification, and then went to her police car to verify his identification.  (Fields Dep. at 52-54; *see also* Hatch Dep. at 42 (testifying Officer Hedges went to her car to do paperwork and to call for a supervisor)).

Fields remembers Officer Stewart ordering Plaintiff to "[s]tay on the ground," and calling him a "faggot."  (Fields Dep. at 51).  He also remembers Officer Stewart telling Officer Hatch, "[D]on't worry about the f-ing taser darts. We'll pull -- don't worry about calling the f-ing ambulance.  We're going to pull these darts out of his [back]."  (*Id.* at 51).  Officer Hatch, whom Fields described as "pretty well tempered," proceeded to remove the taser probes[1] (or darts) from Plaintiff's back.  (*Id.* at 48; *see also* Hatch Dep. at 38, 39 (recalls only having to remove one dart prong located on the left side of Plaintiff's back)).  According to Officer Hatch, a taser probe is shaped like a "very small half arrow" and thus, there is "some pain associated with removing the [dart] from the skin."  (Hatch Dep. at 39).  A photograph of Plaintiff's back showing where the probes penetrated his back reveal only superficial injuries that look like little red spots; the probes did not cause any bruising.  (*Id.* at 161-62; Filing No. 76-2, Plaintiff Dep. Ex. 12 (photo)).

By this time, Schell had come out of the house and was demanding to know what was going on.  (Plaintiff Dep. at 53-54).  He started yelling and screaming at the officers,

---

[1] In the record evidence, the terms "probes," "darts," and "prongs" are used synonymously.

so the officers decided to move to a different location.  (Hedges Dep. at 80-81).  Plaintiff

was transported in the back of one of the officers' patrol cars to a nearby Speedway gas

station to wait on a jail transport van.  (*Id.* at 80; Plaintiff Dep. at 63).

Pursuant to IMPD policy, Sergeant Steve Davis was called to the scene to perform

an investigation because a taser had been deployed.  (Filing No. 76-16, Affidavit of Steve

Davis ¶ 2).  Sergeant Davis completed his Supervisory Special Report while at the gas

station.  (Filing No. 89-4, Internal Affairs Taped Statement at 3).  Sergeant Davis spoke

with Plaintiff and visually examined Plaintiff's back.  (Filing No. 76-16, Affidavit of

Steve Davis ¶ 5).  He saw no bleeding or injuries where the taser probes had made

contact with Plaintiff's skin.  (*Id.* ¶ 6).  He also observed that Plaintiff was stumbling and

needed assistance to stand and it was obvious to him that Plaintiff was drunk.  (*Id.* ¶ 7;

Filing No. 77, Davis Audio Track 10 – 2:12 to 2:20).  Plaintiff denies that he was

intoxicated.  (Plaintiff Dep. at 67) ("I had three or four beers over a three-or-four hour

period and that would not make me drunk."); *see also* Fields Dep. at 20 ("He didn't

appear to be drunk.")).

A jail transport wagon carried Plaintiff from the Speedway gas station to the

Marion County Jail, where Plaintiff was booked into jail around 4:00 a.m.  (Plaintiff Dep.

at 74).  During a medical screening at the jail, Plaintiff denied that he had any medical

problems "such as bleeding or injuries that require[d] immediate medical attention."

(Filing No. 76-12, Jail Medical Record; Plaintiff Dep. at 75).  But Plaintiff remembers

feeling anxiety and "soreness in [his] body."  (Plaintiff Dep. at 75-76).

Later that morning, Officer Hedges prepared a probable cause affidavit listing the "slated charges" against Plaintiff as "public intoxication" and "resisting law enforcement." (Filing No. 76-11, Probable Cause Affidavit). On September 21, 2012, the Marion County Prosecutor charged Plaintiff with two counts of resisting law enforcement and one count of public intoxication, under Cause No. 49F07-1209-CM-065711. (Filing No. 89-12, Charging Information).

Plaintiff was released from the Jail approximately thirteen hours after he first arrived there. (Plaintiff Dep. at 74). Two days later, on September 23, 2012, he went to the emergency room, complaining of "pain in his ribs with deep breaths, lying down and walking." He was assessed as suffering from a broken right rib. (Filing No. 76-2, Plaintiff Dep. Ex. 6). Sergeant Davis stated that a broken rib "is consistent with falling after a tasing." (Davis Internal Affairs Statement at 4).

Plaintiff filed a complaint with the Citizens Police Complaint Office on October 5, 2012, against Officer Hedges and Officer Stewart alleging excessive force, unlawful arrest, and unprofessional conduct. On December 20, 2012, Sergeant John Arvin issued an Internal Affairs Investigation Report regarding Plaintiff's claims. (Filing No. 89-6, Internal Affairs Report). The final disposition of the internal affairs investigation sustained violations against Officer Hatch for a violation of Section I(A) and General Order 1.33 as a result of the taser probes being removed without a supervisor present. (*Id.*). On March 18, 2013, the Citizens Police Complaint Board endorsed the findings of the internal affairs investigation. (Filing No. 89-7, Citizens Police Complaint Board Minutes).

On February 4, 2013, Plaintiff's case was tried by the Marion Superior Court. Following the state's case-in-chief, the court granted Plaintiff's motion for judgment as a matter of law on the public intoxication charge.  (Trial Tr. at 65).  On April 8, 2013, Plaintiff was acquitted of the remaining charges.  (*Id.* at 99).  This case followed.

Any additional facts necessary to the disposition of this motion will be addressed in the Discussion Section.

## II.     Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of designated evidence which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law.  *Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir. 1992).  A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented.

10

*Anderson,* 477 U.S. at 248.  In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chicago,* 599 F.3d 617, 619 (7th Cir. 2010)).  Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party.  *Anderson,* 477 U.S. at 255; *Abdullahi v. City of Madison,* 423 F.3d 763, 773 (7th Cir. 2005) (reversing summary judgment for defendant in excessive force case).

## III.    Federal Law Claims

In Count I of Plaintiff's First Amended Complaint, Plaintiff brings three Fourth Amendment claims against Officer Hedges and in Count II, Plaintiff brings two Fourth Amendment claims against Officer Stewart.  Plaintiff's Fourth Amendment claims are brought under Section 1983.  That statutory section provides a private cause of action against a person who, acting under color of state law, deprives an individual of any "'rights, privileges, or immunities secured by the Constitution and laws'" of the United States.  *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (quoting 42 U.S.C. § 1983).  "Section 1983 is not itself a source of any substantive rights, but instead provides the means by which rights conferred elsewhere may be enforced."  *Bublitz v. Cottey*, 327 F.3d 485, 488 (7th Cir. 2003).

The Fourth Amendment issues presented surround Plaintiff's arrest.  For simplicity's sake, the court will first address Plaintiff's claims against Officer Hedges.

First, he alleges Officer Hedges did not have probable cause to arrest him for either public intoxication or resisting law enforcement.  Second, he alleges Officer Hedges used excessive force against him by tasing him twice.  Third, he alleges Officer Hedges failed to intervene to prevent Officer Hatch from removing the taser probes from Plaintiff's back without an IMPD supervisor being present in violation of IMPD policy.  Officer Hedges argues that summary judgment is warranted because: (1) she did not violate Plaintiff's Fourth Amendment rights and, alternatively, (2) she is entitled to qualified immunity.

### A.    Claims Against Officer Hedges

A determination of qualified immunity must be made early in the litigation, as "[q]ualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.  When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  To defeat the defense, a plaintiff must establish two elements: (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged

12

conduct.  *Id.* at 735; *Pearson*, 555 U.S. at 232.  The court has discretion to determine in which order the questions should be answered; "a negative answer to either one is enough to establish the defense of qualified immunity." *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009).

### 1.    False Arrest

The Fourth Amendment prohibits unreasonable searches and seizures by law enforcement.  To be deemed reasonable, a warrantless arrest (a type of "seizure") made in public must be supported by probable cause. *Gutierrez v. Kermon*, 722 F.3d 1003, 1007 (7th Cir. 2013).  Thus, the existence of probable cause is an absolute defense to a Section 1983 claim of false arrest and false imprisonment.  *Id.* (citing *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)).

Probable cause to arrest exists when an officer reasonably believes, in light of the facts and circumstances within the knowledge of the arresting officer at the time of the arrest, that the suspect had committed or was committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Gutierrez*, 722 F.3d at 1008.   The test is an objective one, which evaluates whether probable cause existed "'on the facts as they would have appeared to a reasonable police officer in the position of the arresting police officer—seeing what he saw, hearing what he heard.'"  *Kelley v. Milar*, 149 F.3d 641, 646 (7th Cir. 1998) (quoting *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992)).  "[P]robable cause does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity—the officer's belief that the arrestee was committing a crime need only be reasonable." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013).  "It is a

practical, commonsense standard that requires only the type of fair probability on which reasonable people act." *Gutierrez*, 722 F.3d at 1008.  To prevail, Officer Hedges must establish, as a matter of law, that she had probable cause to arrest Plaintiff for public intoxication or resisting law enforcement.  *See Abbott*, 705 F.3d at 715 ("[A]n arrest can be supported by probable cause that the arrestee committed any crime, regardless of the officer's belief as to which crime was at issue.").

While the probable cause inquiry allows room for reasonable mistakes by law enforcement, "qualified immunity affords an added layer of protection by shielding officers from suit for damages if a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed."  *Id.* at 714 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)) (internal quotation marks omitted).  Known as "arguable probable cause," "qualified immunity in this context protects law enforcement officers who reasonably, but mistakenly, believe that probable cause exists."  *Id*. at 714-15.  Though they may appear to be the same, the probable cause and arguable probable cause inquiries are separate.  *Id.* at 715. "An arrest without probable cause is a violation of a constitutional right, whereas an arrest without arguable probable cause is a violation of a 'clearly established' constitutional right." *Gutierrez*, 722 F.3d at 1008 (citing *Hunter*, 502 U.S. at 227).  The existence of probable cause or arguable probable cause depends on the elements of the predicate criminal offense under state law.  *Abbot*, 705 F.3d at 715.

14

a.      **Public Intoxication**

1.      **Probable Cause Determination**

The offense of public intoxication is governed by Indiana Code § 7.1-5-1-3, which

provides, "It is a Class B misdemeanor for a person to be in a public place or a place of

public resort in a state of intoxication caused by the person's use of alcohol."  The

purpose of the statute "is to prevent people from becoming inebriated and then bothering

and/or threatening the safety of other people in public places."  *State v. Jenkins*, 898

N.E.2d 484, 486 (Ind. Ct. App. 2008) (internal quotation marks and citation omitted).

The parties' only dispute is whether Plaintiff was on private property at the time of

his arrest.  In *Christian v. State*, 897 N.E.2d 503 (Ind. Ct. App. 2008), the Indiana Court

of Appeals explained:

> A public place does not mean only a place devoted to the use of the public.
> *Jones v. State*, 881 N.E.2d 1095, 1097 (Ind. Ct. App. 2008) (citing *Wright
> v. State*, 772 N.E.2d 449, 456 (Ind. Ct. App. 2002)).  It also means a place
> that is in point of fact public, as distinguished from private—a place that is
> visited by many persons, and usually accessible to the neighboring public.
> *Id.*  A private residence, including the grounds surrounding it, is not a
> public place.  *Moore v. State*, 634 N.E.2d 825, 827 (Ind. Ct. App. 1994).

*Id.* at 504-05.

Defendants argue that Officer Hedges properly arrested Plaintiff in a public place

because a residential driveway is "usually accessible to the neighboring public" and

Plaintiff, being outside at the time of his arrest, could be seen by the public in plain view.

Indiana case law belies their argument.  In *Christian*, the court reversed the defendant's

conviction for public intoxication where she was found in her friend's driveway

attempting to unlock a vehicle.  *Id.* at 505.  In *Jones*, the court reversed a defendant's

15

conviction for public intoxication where the defendant was found intoxicated in a vehicle parked on a private driveway. 881 N.E.2d at 1098. In *Moore*, the court reversed the defendant's conviction for public intoxication where the defendant was observed only in the driveway and backyard of a private residence. 634 N.E.2d at 827. Here, Plaintiff was observed in the front and backyard of Schell's private residence when the events at issue transpired. Pursuant to *Christian*, *Jones*, and *Moore*, Plaintiff was not in a "public place."

### 2.      Qualified Immunity

*Christian*, *Jones,* and *Moore* clearly establish that the grounds, including the driveway, of a residential home are not public places within the meaning of Indiana's public intoxication statute. The facts taken in the light most favorable to Plaintiff reflect that Plaintiff was an invited guest on private property at the time of his arrest, and Officer Hedges was informed of that fact prior to Plaintiff's arrest. (*See* Hedges Dep. at 16, 20, 24, 40, 64 (testifying that when she arrived on scene, she noticed both Fields and Plaintiff in front of Plaintiff's car with the hood up, one of them had a flashlight, Fields informed her of Plaintiff's first name and that Plaintiff went into the backyard to use the restroom)). Officer Hedges, therefore, could not have reasonably, but mistakenly, believed she had probable cause to arrest Plaintiff for public intoxication under Indiana law.

### b.   Resisting Law Enforcement

### 1.      Probable Cause Determination

It is a Class A misdemeanor to commit the crime of resisting law enforcement, which is defined as:

> [a] person who knowingly or intentionally: (1) forcibly resists, obstructs, or interferes with a law enforcement officer . . . . ; or (3) flees from a law enforcement officer after the officer has, by visible or audible means . . . identified himself or herself and ordered the person to stop.

Ind. Code § 35-44.1-3-1.   The question in this case is whether Plaintiff forcibly resisted, obstructed, or interfered with Officer Hedges' duties.

"[O]ne 'forcibly resists' law enforcement when strong, powerful, violent means are used to evade a law enforcement official's rightful exercise of his or her duties." *K.W. v. State*, 984 N.E.2d 610, 612 (Ind. 2013) (quoting *Spangler v. State*, 607 N.E.2d 720, 723 (Ind. 1993)) (internal quotation marks omitted).  In *K.W.*, an officer attempted to handcuff a student, but the student "began to resist and pull away," "turned [and] pulled away."  *Id.* at 612-13 (internal quotation marks and citations omitted).  The Indiana Supreme Court found the evidence insufficient to sustain K.W.'s delinquency adjudication.  *Id.* at 613.  The Court explained, "Merely walking away from a law-enforcement encounter, leaning away from an officer's grasp, or 'twisting and turning a little bit' against an officer's actions, do not establish 'forcible resistance.'"  *Id.* at 612 (internal quotation marks and citations omitted).

Forcible resistance does not require actual physical contact, however.  *Walker v. State*, 998 N.E.2d 724, 727 (Ind. 2013) ("[T]he statute does not require commission of a battery on the officer or actual physical contact—whether initiated by the officer or the defendant.").  It "may be said to occur when a 'threatening gesture or movement . . .

presents an imminent danger of bodily injury [to an officer]."  *Id.*  In *Walker*, for

example, the Indiana Supreme Court held there was sufficient evidence of forcible

resistance where the defendant aggressively advanced toward a police officer with his

fists clenched.  *Id.*

Defendants maintain that, as Officer Hedges was attempting to handcuff Plaintiff,

he quickly turned around and went into a "fighting stance."  (Hedges Dep. at 28).  He

"clenched his fists and did the thousand-yard stare as if he was going to harm [her]."  (*Id.*

at 32).  However, the court must construe the facts and all reasonable inferences drawn

from them in the light most favorable to Plaintiff as the non-moving party.  According to

Fields—the only eyewitness—Officer Hedges grabbed Plaintiff's hand or wrist to

handcuff him, but let go momentarily "fiddling with her cuffs."  (Fields Dep. at 34).

Plaintiff "put [his] hands up in the air" and said, "What is going on?"  (Plaintiff Dep. at

36).  He then started to walk "casually" toward the front door of Schell's house.  (Fields

Dep. at 35-36).  Whether Plaintiff resisted arrest with force is, therefore, a contested issue

of material fact.  Accordingly, the court cannot find as a matter of law that Officer

Hedges had probable cause to arrest Plaintiff for the crime of resisting law enforcement.

### 2.      Qualified Immunity for Resisting Law Enforcement

At the time of Plaintiff's arrest, it was clearly established that the misdemeanor of

resisting law enforcement required "forcible resistance."  *Walker*, 998 N.E.2d at 727;

*K.W.*, 984 N.E.2d at 612; *Spangler*, 607 N.E.2d at 723.  The facts surrounding Plaintiff's

arrest—whether he actively resisted or not—are in dispute; accordingly, the court must

find that Officer Hedges is not entitled to qualified immunity on this issue.  *See, e.g.,*

*Larson v. Cantrell*, 974 F. Supp. 1211, 1218 (N.D. Ind. 1997) ("Although qualified immunity is a question of law that a court should resolve before trial if possible, the court cannot do so where the question turns on facts that are in dispute."); *Brandon v. Vill. of Maywood*, 157 F. Supp. 2d 917, 928 (N.D. Ill. 2001) (denying summary judgment on qualified immunity to officers in false arrest case where fact questions regarding the circumstances of arrest were in dispute). Defendants' motion for summary judgment on Plaintiff's false arrest claim against Officer Hedges is therefore **DENIED**.

### 2. Excessive Force

#### a. Constitutionality of the Use of Force

"[T]he Fourth Amendment prohibits law enforcement from using excessive force during the execution of a seizure." *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. That right, however, is not without limits. A "police officer's use of force is unconstitutional if, 'judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest.'" *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) (quoting *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987)).

In judging the reasonableness of any particular use of force, the court may consider "the severity of the crimes at issue, whether the suspect posed an immediate threat to the safety of others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id*. (citing *Graham*, 490 U.S. at 396). This is an

objective inquiry which requires the court to determine "whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner." *Abbott*, 705 F.3d at 724 (internal quotation marks and citations omitted).  In answering this inquiry, the court must be sensitive to "'the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"  *Id.* (quoting *Graham*, 490 U.S. at 397).

Given the drastically different accounts of the events that occurred in the early morning hours of September 21, 2012, the court finds a genuine issue of material fact as to whether Officer Hedge's use of her taser constituted excessive force.  At the time Officer Hedges attempted to handcuff Plaintiff and ultimately deployed her taser, she was alone, as Officer Hatch and Officer Stewart were conducting an investigation in a neighboring yard.  Thus, a reasonable juror could side with Officer Hedges' account of the facts and determine that Plaintiff was resisting arrest in an intoxicated and erratic state, thus necessitating this use of force.  And because Plaintiff continued to resist even after being hit with the taser probes, a reasonable juror could determine that Officer Hedges' deployment of the taser a second time was reasonable.

But if a reasonable juror were to side with Plaintiff's account of the events, he or she could reasonably conclude that the use of a taser was excessive.  Plaintiff claims he was not intoxicated, was lawfully at Schell's residence trying to fix his car, and was caught by complete surprise when Officer Hedges ordered him to put his hands up.  He claims he was not actively resisting arrest or attempting to evade arrest by flight.  Indeed,

20

he claims that when he asked why she was attempting to arrest him and noticed her grab for her handcuffs, he simply walked away.  The next thing Plaintiff knew, Officer Hedges deployed the taser, not just once, but twice.  Accordingly, the court finds an issue of fact on whether Officer Hedges' use of the taser twice constituted an objectively unreasonable use of force in violation of the Fourth Amendment.  *See Abbott*, 705 F.3d at 730 ("[C]ourts generally hold that it is unreasonable for officers to deploy a taser against a misdemeanant who is not actively resisting arrest.").

### b.     Qualified Immunity

With respect to qualified immunity, it was clearly established at the time of Plaintiff's arrest that an officer could not use more force than is reasonably necessary to execute an arrest.  *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 529-30 (7th Cir. 2012) ("Force is reasonable only when exercised in proportion to the threat posed.") (quoting *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010)); *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 687 (7th Cir. 2007); *Hill v. Miller,* 878 F. Supp. 114, 116 (N. D. Ill. 1995)  ("[I]t is well established that the use of any significant force . . . not reasonably necessary to effect an arrest – as where the suspect neither resists nor flees or where the force is used after a suspect's resistance has been overcome or his flight thwarted – would be constitutionally unreasonable.") (internal quotation marks and citation omitted)).  In particular, it is clearly established that law enforcement cannot use "significant force on nonresisting or passively resisting suspects."  *Abbott*, 705 F.3d at 732 (holding an officer's deployment of a taser in dart mode twice against a nonviolent misdemeanant violated clearly established law).

21

Accepting as true for the limited purpose of summary judgment Plaintiff's contention that he was, at most, a passively resisting suspect at the time Officer Hedges deployed her taser twice, Officer Hedges is not entitled to qualified immunity. Defendants' motion for summary judgment on Plaintiff's claim for excessive force against Officer Hedges is therefore **DENIED**.

### 3.      Failure to Intervene

In *Yang v. Hardin*, the Seventh Circuit held that "[o]missions as well as actions may violate civil rights."  37 F.3d 282, 285 (7th Cir. 1994).  In particular, "under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983."  *Id.*   It is well established in this circuit that:

> [a] law enforcement officer who is present and fails to intervene to prevent another officer from infringing the constitutional rights of citizens is liable under Section 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that the citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Id.* (citing cases) (emphasis in original).  A "realistic opportunity to intervene" may exist "whenever an officer could have 'called for backup, called for help, or at least cautioned [the excessive force] defendant to stop.'"  *Abdullahi*, 423 F.3d at 774 (citing *Yang*, 37 F.3d at 285).  This analysis "is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury *could not possibly conclude otherwise*."  *Id.* (quoting *Lanigan v. Vill. of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997)) (emphasis in original).

22

### a.      Realistic Opportunity to Intervene

Plaintiff argues Officer Hedges failed to protect him from having the taser probes forcibly removed without a supervisor being present in violation of IMPD policy. [2] It is undisputed, however, that Officer Hedges was in her police car at the time Officer Hatch removed the taser probes.  Moreover, Fields testified that Officer Stewart told him to remove them, and Officer Hatch testified that he removed them on his own volition. (Fields Dep. at 49; Hatch Dep. at 38 (testifying he removed the prongs "on my own")). Given that Officer Hedges was not with or near Plaintiff in the moments before Officer Hatch removed the taser probes, and given the lack of evidence that she knew Officer Hatch was going to remove the taser probes without a supervisor present, Officer Hedges did not have a realistic opportunity to intervene and prevent Officer Hatch from doing so. Accordingly, a reasonable jury could not possibly find that Officer Hedges failed to intervene to preclude Officer Hatch from allegedly committing excessive force on Plaintiff by removing the taser probes from Plaintiff's back without a supervisor present.

### b.      Excessive Force

Assuming for the sake of argument that Officer Hedges had a realistic opportunity to prevent Officer Hatch from removing the taser probes from Plaintiff's back, the court now turns to whether Officer Hatch "forcibly" removed the taser probes, such that Officer Hedges could be liable under Section 1983 for failing to intervene.

---

[2] "[Section 1983] protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices."  *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003).  Thus, to the extent Plaintiff bases his failure to intervene claim on the violation of IMPD policy, Plaintiff's Section 1983 claim fails as a matter of law.

One could expect a reasonable amount of force would be needed to remove the probes from Plaintiff's back.  *See James v. Dyer*, No. 14-2283, 2015 WL 1064626, at * 2 (C.D. Ill. March 9, 2015).  Indeed, Officer Hatch testified that, due to the design of the probe, "there is some pain associated with removing the [probe] from the skin."  (Hatch Dep. at 39).  The issue here is whether the force used to extract the probes was *excessive*.

Plaintiff admits that he does not recall the taser probes being removed from his back because, by that point, he "was out of it."  (Plaintiff Dep. at 34, 153-54).  Plaintiff's contention that the probes were "forcibly" pulled from his back is based solely on what Fields told him several days later.  (*Id*. at 153-55).  According to Fields, Officer Hatch pulled the probes out of Plaintiff's back by the cables and "[Plaintiff] winced . . . it just hurt a lot when I watched them pull the darts out of his back."  (Fields Dep. at 47).  Fields also testified that the officers called Plaintiff a "faggot" and that Officer Stewart told Officer Hatch not to worry about calling an ambulance.  Just "pull them out of his back," he said.  (*Id.* at 49).

Yet, the undisputed facts establish that when the probes were removed from Plaintiff's back, neither Fields nor Officer Hatch saw any blood on Plaintiff's back. (Fields Dep. at 49; Hatch Dep. at 61).  Similarly, when Sergeant Davis visually inspected Plaintiff's back, he did not see any bleeding or injuries requiring medical attention. (Davis Aff. ¶¶ 5, 6).  When Plaintiff was seen by medical personnel at the Marion County Jail, he had no medical complaints.  (Jail Medical Record).  When Plaintiff sought medical treatment at a hospital several days later, the medical care providers there observed two "small white pustules" on Plaintiff's back, but noted that Plaintiff had no

24

complaints of associated pain, itching, or burning in that area.  (Plaintiff Dep. Ex. 6).

Plaintiff did not develop any bruising at the location of the penetration and removal of the

taser probes.  (*Id.*; Plaintiff Dep. Ex. 12).  Plaintiff's own photograph of his back shows

that any injuries to his back were purely superficial.  (Plaintiff Dep. Ex. 12).

   Given that Plaintiff does not recall anything about the removal of the taser probes,

had no associated pain, itching, or bruising, and sustained very minor injuries, no

reasonable jury could find that the amount of force used by Officer Hatch was excessive.

Consequently, he cannot show a constitutional violation arising from that incident; and

without a constitutional violation, Officer Hedges cannot be liable to Plaintiff for failing

to intervene to protect him against a constitutional violation.  Accordingly, Defendants'

motion for summary judgment on Plaintiff's failure to intervene claim is **GRANTED**.

### B.   Claims against Officer Stewart

   Defendants seek dismissal of all claims against Officer Stewart based upon the

two-year statute of limitations applicable to his state negligence/personal injury claims

and federal Section 1983 claims asserted in the First Amended Complaint.  *See* Ind. Code

§ 34-11-2-4 (two-year statute of limitations for negligence/personal injury claims); *Bailey*

*v. Faulkner*, 765 F.2d 102, 103 (7th Cir. 1985) ("The statute of limitations that the federal

courts must borrow in a section 1983 suit is the statute of limitations for personal-injury

suits, which is two years in Indiana, Ind. Code § 34-1-2-2.") (internal citation omitted).

Since this is a potentially dispositive issue, the court will address it first.

### 1.      Statute of Limitations

Plaintiff filed this action on May 8, 2014, in the Marion Superior Court naming as defendants the City of Indianapolis and Officer Hedges.  The City and Officer Hedges timely removed the case to federal court.  The parties' Case Management Plan established a September 8, 2014 deadline for the parties to seek leave to amend their pleadings.  (Filing No. 17, Case Management Plan).  On September 8, 2014, Plaintiff moved for leave to amend his complaint to add Officer Stewart as an additional defendant in the case.  (Filing No. 20, Motion for Leave to Amend).  The court granted Plaintiff's motion on November 3, 2014, and Plaintiff filed his First Amended Complaint on November 4, 2014.  (Filing No. 25, First Am. Compl.).  On November 18, 2014, Defendants filed their Answer, at which time Officer Stewart asserted the defense of the statute of limitations, as the statute expired on September 21, 2014.  (Filing No. 31, Answer).  Defendants argue Plaintiff's claims against Officer Stewart are thus time-barred unless they relate back to the original Complaint pursuant to Federal Rule of Civil Procedure 15(c)(1).  Plaintiff responds that equitable tolling applies because he filed the motion for leave to file the First Amended Complaint within the limitations period, but by the time the court granted the motion for leave and the First Amended Complaint was filed, the limitations period had expired.

In the Seventh Circuit, tolling the statute of limitations to account for the time it takes a court to rule on a motion for leave to file an amended complaint is permissible so long as the amended complaint is attached to the motion for leave to amend, or the

motion for leave to amend otherwise puts the opposing party on notice of the content of

the amendment.  In *Moore v. State of Indiana*, the Seventh Circuit explained:

> As a party has no control over when a court renders its decision regarding
> the proposed amended complaint, the submission of a motion for leave to
> amend, properly accompanied by the proposed amended complaint that
> provides notice of the substance of those amendments, tolls the statute of
> limitations, even though technically the amended complaint will not be filed
> until the court rules on the motion.

999 F.2d 1125, 1131 (7th Cir. 1993).

Here, Plaintiff attached the proposed First Amended Complaint to his motion for

leave.  The court granted Plaintiff seven days from November 3 to file his First Amended

Complaint, and he did so the next day.  Under these circumstances, the court finds

Plaintiff's claims against Officer Stewart are timely.  *See also Snow v. Warren Power &*

*Machinery, Inc.*, 354 P.3d 1285, 1291-92 (N.M. 2015) (holding, under equitable tolling

principles, the plaintiff's amended complaint was deemed filed as of the date of the

original complaint where motion for leave to amend was filed within the limitations

period, but the court granted leave to amend after the limitations period expired).  The

court now turns to the federal constitutional claims at issue.

### 2.    Constitutional Claims

The parties dispute which federal claims are asserted against Officer Stewart in the

First Amended Complaint.  Plaintiff asserts that he sufficiently pleaded Fourth

Amendment claims for unlawful arrest, false imprisonment, excessive force, and failure

to intervene.  Moreover, he argues, these claims were "specifically theorized in his

Statement of Claims."  Plaintiff's Statement of Claims states that Officer Stewart

"assisted in effectuating [Plaintiff's] arrest without probable cause" and "was in a position to keep Officer Hedges from tasing [Plaintiff] and to keep Officer Hatch from removing the taser probes in violation of IMPD policy." (Filing No. 69, Statement of Claims at 5). But a party may amend his pleading only with leave of court, and not by asserting a new claim in his or her Statement of Claims. Fed. R. Civ. P. 15(a)(2); *Hankins v. Cox*, No. 1:14-cv-00886-TWP-DML, 2015 WL 1800500, at *2 (S.D. Ind. April 15, 2015) ("Neither the statement of claims nor the supplemental statement of claims is a pleading."). Accordingly, the court looks to Plaintiff's First Amended Complaint to determine whether Plaintiff properly alleged Fourth Amendment claims against Officer Stewart.

The Fourth Amendment claims asserted against Officer Stewart include the following allegations: (1) Officer Stewart is a "person" under Section 1983 and his actions were taken under color of state law; (2) the Fourth Amendment provides that people shall be secure in, *inter alia*, their persons and effects against unreasonable searches and seizures; (3) Officer Stewart's actions and omissions constituted a violation and a deprivation of Plaintiff's rights under the Fourth Amendment; and (4) Officer Stewart had a realistic opportunity to do something to prevent harm to Plaintiff. (Filing No. 26, First Am. Compl. ¶¶ 56-61). These overgeneralized allegations are insufficient to put Officer Stewart on notice of claims for false arrest/false imprisonment and excessive force. And even if they were sufficient to put Officer Stewart on notice, Plaintiff's claims would fail because Officer Stewart neither made the decision to arrest Plaintiff nor had any part in the tasing of Plaintiff.

28

Plaintiff does state a claim against Officer Stewart for failure to intervene, however.  In his Statement of Claims, he explains that "Officer Stewart was in a position to keep Officer Hedges from tasing [Plaintiff] and to keep Officer Hatch from removing the taser probes in violation of IMPD policy."  (Statement of Claims at 5).  The viability of those claims is discussed below.

### 3.       Failure to Intervene

With respect to his first claim—that Officer Stewart failed to intervene to prevent Officer Hedges from tasing him—the undisputed facts establish that by the time Officer Stewart arrived on the scene, Plaintiff had already been tased and was lying on the ground.  (Field Dep. at 37-38; Trial Tr. 13, 20, 88; Stewart Dep. at 48-49).  Because Officer Stewart was not present when Officer Hedges deployed her taser upon Plaintiff, Officer Stewart did not have a realistic opportunity to intervene to prevent Officer Hedges from doing so.

With respect to his second claim—that Officer Stewart failed to intervene to prevent Officer Hatch from forcibly removing the taser probes from Plaintiff's back—nothing about Officer Hatch's removal of the taser probes from Plaintiff's back violated the federal constitution.  Accordingly, Officer Stewart cannot be liable to Plaintiff for failing to intervene to protect him from suffering a constitutional violation.  Therefore, Defendants' Motion for Summary Judgment on the Fourth Amendment claims against Officer Stewart is **GRANTED**.

29

## IV.    State Law Claims

Plaintiff also brings state law claims against Officer Hedges.  In Count III, Plaintiff alleges Officer Hedges committed battery when she deployed her taser on him without sufficient cause to do so.  In Count VI, Plaintiff alleges Officer Hedges is liable for malicious prosecution for instituting the criminal proceeding against him without probable cause to do so.  And in Count IX, [3] Plaintiff generally alleges that all Defendants were negligent.  Because Plaintiff does not respond to Defendants' motion with respect to the negligence claim, Defendants' motion is **GRANTED** on Count IX.

### 1.    Battery – Individual Capacity Claim

The Indiana Tort Claims Act ("ITCA") provides that "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally."  Ind. Code § 34-13-3-5(b).  Subsection (c) provides that "[a] lawsuit filed against an employee personally must allege that an act or omission of the employee that causes a loss is: (1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit the employee personally."  Ind. Code § 34-13-3-5(c).  The complaint must also contain a reasonable factual basis supporting the allegations.

In paragraphs 7 and 47 of Plaintiff's First Amended Complaint, Plaintiff alleges that Officer Hedges "was at all relevant times . . . an officer with the Indianapolis Metropolitan Police Department" and that her "actions and/or omissions were taken

---

[3] The parties filed a Joint Stipulation of Dismissal as to all other state law claims.  (*See* Filing No. 70, Joint Stipulation of Dismissal).

under color of state law based on her authority and official position as an officer with

IMPD." (First Am. Compl. ¶¶ 7, 47). Plaintiff's express contention that Officer Hedges

was acting within the course and scope of her employment based on her authority and

official position as an officer with the IMPD bars his battery claim against her in her

individual capacity as a matter of law. *City of Gary v. Conat*, 810 N.E.2d 1112, 1118

(Ind. Ct. App. 2004) ("[O]ur supreme court recently decided that I.C. § 34-13-3-5(b)

should be interpreted as standing for the proposition that a plaintiff cannot sue a

governmental employee personally if the complaint, on its face, alleges that the

employee's acts leading to the claim occurred within the scope of employment.") (citing

*Bushong v. Williamson*, 790 N.E.2d 456, 471 (Ind. 2003)).

Notwithstanding Plaintiff's scope-of-employment allegations, Plaintiff argues that

Officer Hedges' use of a taser under the circumstances rises to the level of criminal,

malicious, or willful and wanton acts. Yet Plaintiff has not satisfied subsection (c) of

Indiana Code § 34-13-3-5; Plaintiff's First Amended Complaint does not allege that

Officer Hedges' actions were criminal, malicious, and/or willful and wanton.

Furthermore, the Indiana Supreme Court addressed the meaning of "scope of

employment" in the context of governmental immunity and explained that even an

employee's intentional criminal acts may fall within the scope of his employment "if [the

employee's] purpose was, to an appreciable extent, to further his employer's business."

*Celebration Fireworks, Inc. v. Smith*, 727 N.E.2d 450, 453 (Ind. 2000) (citing *Kemezy v.

Peters*, 622 N.E.2d 1296, 1298 (Ind. 1993)). At the time Officer Hedges tased Plaintiff,

she was on-the-clock, in uniform, and investigating a reported burglary in progress. She

was authorized to investigate the complaint and question Fields and Plaintiff, and to use force when objectively reasonable to do so.  Accordingly, Plaintiff's state law battery claim asserted against Officer Hedges in her individual capacity fails as a matter of law.

### 2.    Battery – Respondeat Superior Claim Against the City

Plaintiff also alleges that he brought a state law battery claim against Officer Hedges in her official capacity (i.e., against the City under the theory of respondeat superior) in his Statement of Claims.  Because Defendants failed to address his state law battery claim against the City of Indianapolis, he argues, Defendants have waived the right to defend against that claim on summary judgment.

As noted above, Plaintiff may not amend his pleadings through his Statement of Claims.  Fed. R. Civ. P. 15(a)(2); *Hankins*, 2015 WL 1800500, at *2.  Turning to Plaintiff's First Amended Complaint, the court finds it was not drafted in a manner that would have given the Defendants fair notice of an official capacity battery claim.  Each count contains a heading setting forth the claim and the defendant(s) to which the claim applies.  In Count III, for example, the heading reads "Count III – Officer Hedges" and in Count IX, it reads "Count IX – All Defendants."  Plaintiff's Count III does not contain any language indicative of an intent to hold the City liable for Officer Hedges' actions.  Accordingly, the court will not consider this claim.

### 3.    Malicious Prosecution – Individual Capacity

The ITCA provides that "[a] governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . [t]he initiation of a judicial or administrative proceeding."  Ind. Code § 34-13-3-3(6).  This subsection

grants immunity to Indiana governmental units and employees, including police officers, in actions for malicious prosecution. *F.D. v. Ind. Dep't of Child Servs.*, 1 N.E.3d 131, 137 (Ind. 2013) (citing *Livingston v. Consol. City of Indianapolis*, 398 N.E.2d 1302, 1306 (Ind. Ct. App. 1979)); *see also Serino v. Hensley*, 735 F.3d 588, 593 (7th Cir. 2013) ("[T]he Indiana Tort Claims Act grants broad immunity to Indiana government units and employees from malicious prosecution actions.").

In his First Amended Complaint, Plaintiff alleges that Officer Hedges "was at all relevant times . . . an officer with the Indianapolis Metropolitan Police Department" and that her "actions and/or omissions were taken under color of state law based on her authority and official position as an officer with the IMPD." (Am. Compl. ¶¶ 7, 47). Plaintiff's allegation that during Officer Hedges' encounter with Plaintiff, she was acting within the course and scope of her employment, bars his claim for malicious prosecution against Officer Hedges in her individual capacity.

Plaintiff attempts to recast his malicious prosecution claim into a federal constitutional claim under the Fourth and Fourteenth Amendments. Plaintiff first asserted a federal claim in his Statement of Claims. As stated above, a claim asserted in a Statement of Claims is not tantamount to a court-authorized amendment of his First Amended Complaint. Accordingly, the court will not consider it.

**V.     Conclusion**

The court finds genuine issues of material fact exist on whether Officer Hedges had probable cause to arrest Plaintiff for resisting law enforcement and on whether Officer Hedges used excessive force. Accordingly, Defendants' Motion for Summary

Judgment (Filing No. 74) is **DENIED** with respect to Plaintiff's Section 1983 Fourth

Amendment claims for false arrest/false imprisonment and excessive force against

Officer Hedges.  The court further finds no genuine issue of material fact exists on the

balance of Plaintiff's federal and state law claims.  Accordingly, Defendants' Motion for

Summary Judgment is **GRANTED** with respect to Plaintiff's Section 1983 Fourth

Amendment claims alleging Officer Hedges and Officer Stewart failed to intervene and is

**GRANTED** with respect to Plaintiff's state law battery and malicious prosecution claims

against Officer Hedges, and Plaintiff's negligence claim against Officer Hedges, Officer

Stewart, and the City.


**SO ORDERED** this 18th day of May 2016.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana



Distributed Electronically to Registered Counsel of Record.